**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

MARISSA D. HERMSEN,            )
              Plaintiff,       )
                              )
    v.                         )
                              )   No. 14-1096-CV-W-FJG
CITY OF KANSAS CITY, MISSOURI, et al.,   )
              Defendants.       )

**ORDER**

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 27).

## I.  Background

Plaintiff was a paramedic employed by defendant City through May of 2014. In July of 2011, Plaintiff filed a lawsuit against the City under the Fair Labor Standards Act ("FLSA"), claiming that defendant failed to properly calculate overtime payments for paramedics and EMTs. Plaintiff claims in the present case that, beginning at the time she filed her FLSA case, defendants began to target her in retaliation, ultimately resulting in her termination.  In the current suit, plaintiff brings two claims:  Count I, FLSA Retaliation; and Count II, Wrongful Discharge.

Defendants City of Kansas City, Missouri ("City") and Paul Berardi ("Berardi") move for summary judgment on the following bases:  (1) Plaintiff cannot satisfy the McDonnell-Douglas burden shifting analysis to show retaliation; (2) Plaintiff cannot sustain her wrongful discharge claims against the City due to sovereign immunity or against Defendant Berardi due to the lack of employer/employee relationship, official immunity, and qualified immunity; and (3) punitive and emotional distress damages are unavailable under the FLSA rubric.  In her response, plaintiff withdraws her wrongful discharge claims in Count II; however, plaintiff maintains that questions of material fact

remain for trial on her FLSA retaliation claims, and her claims for punitive damages and emotional distress damages are not precluded by the FLSA.

## II.  Facts

Hermsen was employed by Metropolitan Ambulance Services Trust ("MAST") from 2003 until 2010 when MAST merged with KCFD. Plaintiff was then employed as a paramedic with the City of Kansas City, Missouri from April 2010 through May of 2014.

Sometime before March 7, 2011, Hermsen spoke to Lisa Minardi, Councilman Ed Ford's Assistant, concerning her intention to blow the whistle on the City for FLSA violations. Lisa Minardi was married to Paul Ferguson, who worked at Hermsen's fire station. Hermsen gave Minardi a document titled, Violations of FLSA Committed by KCFD concerning Ambulance Personnel and the Inevitable Financial Liability to Kansas City ("Warning Paper"), to give to Councilman Ford. (Warning Paper, Ex. 21 to Doc. No. 31); (Hermsen Dep., Ex. 1 at 16:13-18:24). Hermsen told paramedic supervisors Scott Raak and Laura Sanchen; her partners, Andrew Hanchette and Chad Huismann; and Michael Cambiano, International Association Fire Fighters Local No. 42 ("Union") Administrator; that she was going to give the Warning Paper to Lisa Minardi. Between March 2011 and July 29, 2011, Hermsen was blamed in union meetings and elsewhere for starting an investigation into the legality of the 24-hour shift for paramedics and EMTs.

### FLSA Action

On July 29, 2011, Plaintiff became the named plaintiff in a FLSA action filed in the Western District of Missouri which sought damages for the City's failure to pay paramedics and EMTs appropriate overtime wages. A second named plaintiff, Andrea Armillio, joined the FLSA lawsuit on August 15, 2011. The command staff was disappointed about the filing of the FLSA suit. According to Dyer's deposition, the suit turned back six months of the work that had been done. Captain Wright sent

correspondence and had conversations with Chief Dyer and others at the City indicating his belief that the 24-hour shift policy for EMS units did not violate the FLSA, and on October 28, 2011, the Union filed a Motion to Intervene in plaintiff's FLSA action. (Civil Docket for Case No. 4:11-cv-00753-BP, Ex. 27). Chief Dyer and Chief Berardi were heavily involved in the integration of MAST personnel, including the 24-hour shift that became the subject of Hermsen's FLSA lawsuit. (Dyer Dep., Ex. 17 at 69:14-24, and 72:10-73:11).

On September 24, 2012, Judge Beth Phillips granted in part Plaintiffs' Motion to Certify the Class in the lawsuit against the City, with Plaintiff serving as the class representative for paramedics and Andrea Armilio as the class representative for EMTs. On May 15, 2013, Plaintiff filed her Second Phase (liability) Discovery Requests on the City in the FLSA lawsuit which were returned December 19, 2013.  On July 22, 2013, Chief Berardi was deposed in plaintiff's FLSA suit. Hermsen attended Chief Berardi's deposition. On or about January 8, 2014, Plaintiff filed a Motion for Partial Summary Judgment as to liability in the FLSA lawsuit. On or about April 7, 2014, Plaintiff moved for leave to file supplemental authority in the FLSA lawsuit that rejected the City's defense. On June 25, 2014, the Court granted Plaintiff's Motion for Summary Judgment as to Liability in the FLSA lawsuit. (Civil Docket, No. 4:11-cv-00753, Ex. 27).

A second FLSA class action was brought for the purpose of including those class members entitled to relief but who failed to opt in to the first class action. The named plaintiff in the second FLSA lawsuit was Diana Frisbee. In all, 244 paramedics and EMTs received compensation under the two lawsuits. All but six of those 244 paramedics and EMTs are still employed by the City, have retired, died, or have voluntarily resigned from the fire department. Of the six that were terminated, two were terminated for misconduct; two abandoned their job and were terminated; one was unable to perform the physical

requirements of the job; and one was terminated after a felony conviction yielding a three-year prison sentence.

**The Fire Department**

When Plaintiff joined the fire department in 2010, Chief Richard Dyer was the fire chief. In July 2012, Chief Dyer retired. Defendant Berardi was appointed interim fire chief in August 2012, and in January 2013, Defendant Berardi became the fire chief.

**Defendant City's Disciplinary System**

The Fire Chief is primarily responsible for serving as the hearing officer in all disciplinary matters involving fire personnel and usually knows of all discipline administered. During predetermination hearings, those facing discipline are afforded the right to be represented by counsel and the Union, to present evidence, to call and cross-examine witnesses, and make opening and closing statements.[1] An employee, if he or she has been demoted, suspended, or terminated, is able to appeal the predetermination hearing decision to the Human Resources Board. Ex. I, Kansas City Charter, § 901(b)(1). The Human Resources Board may administer oaths, compel the production of evidence, and compel the attendance of witnesses. Ex. I, § 907(c); Ex. J, Rules and Regulations of the Human Resources Board, §§ 9, 14. A hearing before the Human Resources Board is recorded by a court reporter and the hearing is conducted in accordance with the contested case rules of procedure set forth in Chapter 536 of the Missouri Revised Statutes. Ex. J, §§ 13, 16. Disciplined employees are able to appeal the decision of the Human Resources Board to the City Manager. Ex. I, § 907(f). The City Manager may affirm, change, modify or reverse decisions of the Human Resources Board.

---

[1] Plaintiff argues that this is an overgeneralization, but none of her evidence in opposition shows that this statement is not true. The Court does, however, take into consideration plaintiff's arguments and evidence that she may have been targeted for discipline whereas other employees who engaged in similar conduct were not.

4

The City's Whistleblower Protection Ordinance prohibits disciplinary action against City employees for reporting violations of law. (Ordinance No. 990311, Ex. 18). Chief Berardi is required to investigate all allegations of retaliation. The City also has to report allegations of harassment to the EEO office. Chief Berardi has never disciplined anyone for failing to report a complaint of discrimination, harassment or retaliation under the reporting requirement. The City's Discipline policy lists causes for disciplinary action that include, but are not limited to, offensive behavior, offensive language, and discrimination. Offensive conduct that is prohibited by includes "being boisterous towards your supervisor, using foul language in an aggressive manner, throwing things, refusing to follow an order . . . being rude not only to your supervisor, but to a peer employee …" It is also a violation of the disciplinary policy to file a false complaint. Disruptive conduct is also prohibited. The City's policy also prohibits harassment or intimidation that is recurrent in nature and/or having a detrimental effect on the employee's employment situation. The City has a zero-tolerance policy regarding threats or acts of violence and "any employee . . . who makes a threat of physical violence . . . will be dealt with immediately." (City of Kansas City Human Resources Rules & Policy Manual, Ex. 20 at Appendix I).

**Plaintiff's Disciplinary History**

### After Notifying Councilman Ford, but Before Filing Lawsuit

On June 6, 2011, plaintiff responded to a motor vehicle accident involving an elderly woman, who had been t-boned but exhibited no symptoms. Plaintiff photographed the car, allegedly to show the ER physician the mechanism of injury. Because of this incident, a supervisor argued with her at the scene.   On or about June 15, 2011, Plaintiff was disciplined for failure to use proper titles and being disrespectful of her supervisor; failure to obey a lawful order of her superior; and taking photographs of the accident in violation of the Fire Department's General Administrative Guidelines. Ex. K, Resolution of

Personnel Matter, ¶¶ 1-3. Plaintiff received a twelve-hour suspension for her actions on June 6, 2011. Ex. K, ¶ 5. The June 6, 2011 incident was the first time Hermsen was disciplined by KCFD.

On June 15, 2011, Plaintiff was involved in an altercation with a co-worker. Plaintiff asserted that her co-worker Wayne Ashurst had been rude to her for weeks prior and was the aggressor when he yelled at her while retrieving supplies "Get the f--- out of my office," and they then exchanged words. Plaintiff's Ex. 3. For her part in this matter, plaintiff received a written reprimand. Ex. K, ¶ 6. With respect to this matter, Plaintiff waived her rights to a predetermination hearing and other remedies that she may have had available to her. Ex. K, ¶¶ 7, 8.[2]

On June 30, 2011, Plaintiff left the station she was assigned to in order to go home; as a result, the ambulance she was stationed on missed a call. Ex. L, Human Resources Board decision, Case No. 11-32, ¶ 2. Plaintiff asserted that she had received permission from her direct supervisor, Paul Ferguson, on that date to tend to a personal matter. On August 4, 2011, Plaintiff attended a predetermination hearing concerning the June 2011 absence from work. On August 25, 2011, Chief Dyer recommended in his predetermination hearing report that Plaintiff be suspended for 24 hours. On September 1, 2011, Ms. Hermsen appealed the August 25, 2011 predetermination hearing report to the Human Resources Board. On March 13, 2012, the Human Resources Board held its hearing. The Human Resources Board ruled on May 8, 2012 that Plaintiff "did not properly follow the Fire Department's chain of command as set forth in the Fire Department's Rules." Ex. L, p. 3 ¶ 4. The Human Resources Board, however, found that Plaintiff "believed the captain of whom she asked permission to leave had the authority to grant

---

[2] With respect to this statement of fact, plaintiff attempts to controvert by pointing out that her union representative in this matter was ineffective. The Court does not believe that plaintiff's interactions with the union are relevant with respect to this fact, especially considering that she was only given a reprimand.

her request." Ex. L, p. 3, ¶ 2. The Human Resources Board overturned the suspension recommended by Chief Dyer and, instead, reduced the suspension to a letter of reprimand and counseling. Plaintiff received a letter of reprimand and counseling for this incident on May 15, 2012. Plaintiff did not appeal the decision of the Human Resources Board concerning the June 2011 absence to the City Manager.

### After filing FLSA Action

On or about December 11, 2012, Plaintiff responded to a medical call in an auditorium involving a female patient that fainted during a play. The following day, a Battalion Chief filed a complaint against Plaintiff because she did not "run" down the aisle to render aid. The City conducted a fact-finding into the complaint about the December 11 incident. Plaintiff was cleared of any wrongdoing and did not receive discipline for the December 11, 2012 call.

On January 31, 2013, Plaintiff received an oral reprimand for failing to report an accident to her supervisor and for failing to notify her supervisor of damage to City property. Ex. P, Memorandum of Oral Reprimand. As described by plaintiff, during a huge snow storm, Hermsen was riding in the ambulance with her partner, Andrea Armilio. Ms. Armilio slid off the road and went up a curb. While waiting for the tow truck Armilio and Hermsen got the ambulance off the curb. Hermsen and Armilio did not notice that snow had knocked the running board loose until they returned to the station. They continued to run calls for the next thirteen hours and the incident was verbally reported to a supervisor. (Hearing of May 14, 2014, Ex. 6 at 109:7 – 110:23). Plaintiff did not appeal the oral reprimand. Ex. E, ¶ 12.

On June 12, 2013, Plaintiff threw a water bottle at her supervisor, Brenda Paikowski. Doc. 1, ¶ 32; Ex. Q, 8/5/13 Predetermination report, p. 1. Plaintiff characterizes this incident as horseplay; however, plaintiff was investigated for

committing a "violent act". On July 24, 2013, a predetermination hearing was held for the water bottle incident. On August 5, 2013, Defendant Berardi issued a predetermination hearing report that found Plaintiff "engag[ed] in offensive conduct toward another member of the Department when, at the Eastwood facility on June 12, 2013, Hermsen threw an object at Assistant Division Chief Brenda Paikowski which struck her on the leg." Ex. Q, p. 4. In his report, Defendant Berardi recommended that Plaintiff receive a 26.6 hour suspension, but that the suspension would be held in abeyance and shall not be served if Plaintiff participates in an Employee Assistance Program for Anger Management. Ex. E, ¶ 13; Ex. Q, p. 4-5. Plaintiff did not appeal the June 2013 water bottle incident to the Human Resources Board. Ex. E, ¶ 14; Ex. O, 91:5-14. On January 21, 2014, Assistant Chief Pat Reisenbichler emailed the EAP provider and asked "to delay the release of Marissa from the EAP mandate," despite the fact that Hermsen successfully completed EAP counseling on December 9, 2013. (EAP Progress Report of January 21, 2014, Ex. 43); (EAP Management Referral Update, Ex. 39).

On or about December 7, 2013, Plaintiff responded to a multi-vehicle fatality crash at 12th and Hardesty. Doc. 1, ¶ 38. The scene was a chaotic mess with three paramedics working on a deceased motorist while neglecting two other patients, and therefore Hermsen grabbed one of the paramedics on the scene (Elizabeth Bechtold) to communicate with her about the other patients. After Ms. Hermsen transported her patient to Truman Medical Center ("Truman") she saw Paramedic Jonathon Koen who was visibly upset. (Email of Dec. 9, 2013, from Hermsen to Latta and David Dexter, Ex. 40). A Truman nurse approached Hermsen and informed her that Koen accused Hermsen of putting her hands on a co-worker at the fatality accident scene. Hermsen went to the Truman garage and asked Koen what was going on. Paramedic Koen yelled at Ms. Hermsen, standing only inches from her face and said, "I saw what you did, fucking

jerking her around and grabbing her. You have no right to touch her or any other co-worker. Don't you ever let me see you lay a hand on anyone again or next time I'm going to get involved and take care of it myself! She was my student last year and you better not ever touch her again or it's me you're going to deal with." Hermsen tried to reason with Paramedic Koen, but he lunged at her forcing her back and trapped her against the cement pillar in the garage and the ambulance. Plaintiff asserts that her written complaint against Paramedic Jonathon Koen was the only pending complaint filed immediately after the fatality accident. Plaintiff states she called Bechtold later that evening, and Bechtold told her that she had no issue with her.

On February 5, 2014, charges were brought against Hermsen for interfering with patient care and inappropriate conduct. After taking evidence on March 7, 2014, Defendant Berardi concluded that "while PM Hermsen feels it was appropriate to grab another employee to emphasize that she needed additional information about her patient, or to guide that employee through a narrow passage at an emergency scene, PM Bechtold, as well as other personnel on scene did not appreciate the gesture and felt it was inappropriate." Ex. R, 3/10/14 Predetermination Decision, p. 2.   Plaintiff received a written reprimand for grabbing PM Bechtold. Ex. R, p.2.

On February 17, 2014, plaintiff went to Station 18 and had a conversation with Elizabeth Bechtold about the December 7, 2013 incident. Plaintiff and defendants dispute whether plaintiff was told prior to this incident to refrain from speaking with those who responded to the December 7, 2013 accident scene. While Hermsen spoke to Bechtold, Paramedic Schimming came across the bay, shouted vulgarities and stepped about two feet in front of Ms. Hermsen's face in a threatening manner and demanded that Ms. Hermsen leave the station. (Hearing of May 14, 2014, Ex. 6 at 33:24-34:4 and 134:6-135:4). On February 21, 2014, Ms. Hermsen learned that charges were filed

against her for engaging in offensive conduct and interfering with a witness due to her conversation with Ms. Bechtold. (Fact Finding of Feb. 21, 2014, Ex. 45).

On March 17, 2014, Chief Berardi issued a Predetermination Hearing letter to Hermsen charging her with hindering the effective performance of a municipal government function and engaging in offensive conduct due to her questioning of Bechtold on February 17, 2014. On April 11, 2014, Chief Berardi notified Hermsen that she was immediately suspended without pay and would be terminated in seven days for the charge of engaging in offensive conduct and hindering the effective performance of a City function.

On April 14, 2014, Hermsen appealed Chief Berardi's termination of her employment to the HR Board. On May 14, 2014, the Human Resources Board conducted a hearing into the February 2014 confrontation. Ex. S, Human Resources Board decision, Case No. 14-06, p. 1. The Appeal before the City's Board concerning Hermsen's termination included a charge for abuse or improper treatment of a person in custody and conduct that was disruptive or caused deficiencies in the workplace. These two charges were not included in Chief Berardi's termination letter. The KCFD does not have arrest capability. There were no inefficiencies that occurred due to Hermsen's two minute conversation with Elizabeth Bechtold.

On August 11, 2014, the HR Board upheld Hermsen's termination. The Human Resources Board found that "[p]rior to [Ms. Hermsen's] predetermination hearing regarding the December [2013] incident, at which [Ms. Bechtold] would be called to testify, [Ms. Hermsen] confronted [Ms. Bechtold] on February 17, 2014, at Fire Station 18 and demanded to talk about such incident. [Ms. Bechtold] told [Ms. Hermsen] that she did not want to discuss the December incident but [Ms. Hermsen] continued to attempt to engage [Ms. Bechtold] in a discussion of such incident." Ex. S, p. 2, ¶ 2. As a result of

these findings, the Human Resources Board determined that Plaintiff violated Fire and City rules "by her offensive behavior and by engaging in conduct intended to obstruct a predetermination hearing when she knew, or should have known, that her actions were inappropriate." Ex. S, p. 3. As a result of its findings, the Human Resources Board held that there was "sufficient evidence to support [Plaintiff's] termination." Ex. S, p. 3.

On August 18, 2014, Hermsen appealed the HR Board termination decision to City Manager, Troy Schulte.[3]

**Other Incidents of Alleged Retaliation**

In 2011, after the filing of the FLSA lawsuit, Ms. Hermsen was followed home from work by individuals in pick-up trucks that displayed KCFD stickers. Hermsen was warned by Lesa Gonzalez that fire fighters were trying to kill her dog. Additionally, fire fighters blocked Hermsen's car in at the station. These incidents were reported to fire administration Scott Raak, Laura Sanchen and Michael Cambiano.

On August 1, 2011 (three days after the FLSA suit was filed), Plaintiff's counsel in the underlying FLSA suit sent a letter to the City Attorney and Chief Dyer highlighting seven negative comments (including publication of her home address) made about Plaintiff on the website Tony's Kansas City (which is not affiliated with the City of Kansas City). Ex. T, 8/1/11 Ltr. from Hodgson.[4] Each of the comments was posted by

---

[3] To the Court's knowledge, the results of this appeal do not appear in the record.

[4] These comments include:

"Marissa is full of shit. She should have been fired years ago because she is a shitty medic who treats her pts like shit. Every time she fucks up she hides behind the union and then as soon as her job is saved she talks shit on them until her next fuck up."

"She lives at 565 Campbell Street, and she's not a nigger?"

"Hey thanks for providing Marissa's home address!"

"She must not have anything left with all the coke she buys to live in that rat hole."

"Anonymous," and plaintiff does not know if the posters were City employees. Chief Dyer testified he did not investigate the comments because he knew of no way to track the identities of anonymous posters on a third-party website, other than by using tools available to the FBI and not the City. Ex. U, Dep. of Richard Dyer, 33:6-34:15. Chief Dyer did not issue a department-wide bulletin concerning retaliation (nor did he take any corrective action in response to the Tony's Kansas City comments), as, in his experience, "[t]hat is only likely to bring about problems for [the identified] employee." Ex. U, 33:6-34:15.

On August 27, 2011, a message reading "New EMS CREWS!! If you don't like it Leave or if you do like it leave" was found on the white board attached to the EMS locker. Ex. V, 8/27/11 white board message. On August 30, 2011, a message reading "If you don't like it leave" was found on the white board attached to the EMS locker. Ex. V, 8/27/11 white board message. Chief Dyer agreed that the above-described comments posted on the white board on the EMS locker violated Rule 11, which describes acts that can result in disciplinary action, including termination. (Dyer Dep., Ex. 17 at 34:16-35:19); (City Rule 11 Corrective Action, Ex. 29). Chief Berardi agreed that the comments on the EMS locker warrant an investigation. (Berardi Dep., Ex. 19 at 47:6-11). Chief Dyer was never made aware of the messages left on the white board on the locker and is responsible for disciplinary actions that involve suspensions, demotions, and terminations. (Dyer Dep., Ex. 17 at 10:8-21 and 34:20-35:19). Chief Berardi never conducted an investigation into the comments. (Berardi Dep., Ex. 19 at 47:12-14).

---

"Here's a photo of the cunt from a few years ago."

"Looks like a lesbian from the photo."

"I'd eat her pussy any day of the week!"

Ex. T, 8/1/11 Ltr. from Hodgson.

12

On September 16, 2011, it was reported to Chief Dyer that an icon reading "Marissa Hermsen is a CUNT" existed on a computer at Station 35. Ex. W, 9/11 email chain, KCMO_0005244. Chief Dyer had the computers removed from Station 35 and reported the conduct to the City's EEO office. The City conducted interviews and a forensic analysis of the computer to determine who created the icon. The IT department was able to determine that the offensive icon was created under the login identification of Andrew Hanchette. However, Mr. Hanchette was logged onto five separate station's computers that day, and when questioned noted that he frequently forgot to log off of computers he was signed on to. Additionally, Mr. Hanchette was on leave the date that the icon was created and was one of the original reporters of the offensive icon. The City did not discipline any parties for the creation of the offensive icon. No further reports of offensive comments on City computers were made after Chief Dyer had the computers removed from Station 35.

On January 31, 2012, Dispatcher Anne Lewis posted a negative comment about Hermsen on the Union's Facebook page, which is open to those who are captain and below:

> Am I seriously the only one who has come to the reality that the issues with EMS not getting OT is due to a certain pending lawsuit and on the very sliiiiiim chance the dept loses . . . and I do mean slim . . . . the financial liability behind that??? I mean come on!!! Hello …. They hire OT for dynamics and suppression, but rarely, if EVER, for statics!!! Are dynamics or suppression listed in the lawsuit!!! Nooooooo. I can draw you a picture if that would be easier! You all have one person to thank for this and TRUST ME that person now gets PLENTY of OT.

(Union Facebook Page, Ex. 30); (Hermsen Dep., Ex. 1 at 44:1-11). On February 6, 2012, Hermsen made a formal complaint to her supervisor that Anne Lewis dispatched her to a scene that was not secure:

> My biggest concern of having her dispatch while I am working is, as you will see in the Facebook post she made directly after the incident, she has made it clear her opinion on the FLSA lawsuit I have filed against the City. I

> believe she will again use her access to information and abuse her position to retaliate against me due to the suit and her personal vendetta against me.

(Email of Feb. 6, 2012 from Hermsen to Brenda Paikowski, Ex. 31). Chief Dyer admitted that he was aware of the information in Hermsen's complaint about Ms. Lewis and no one interviewed her. (Dyer Dep. Ex. 17 at 54:25-55:4 and 58:10-12).[5]

In February 2012, Captain Cashen got out of his pumper and started yelling obscenities at Hermsen because he purportedly was upset that the police department delayed patient care. (Hermsen Dep., Ex. 1 at 65:24-67:12). Captain Cashen had been outspoken against Hermsen in social media and in Union meetings ever since she filed the FLSA suit, but remains employed by the City. (Hermsen Dep., Ex. 1 at 69:20-70:6); (Dyer Dep., Ex. 1 at 66:11-13). Captain Cashen may have been counseled regarding his language, his body language, and his approach to the incident, but received no discipline other than that. (Dyer Dep., Ex. 1 at 60:21-61:2, 65:3-8 and 66:11-16).

In 2014, KCFD employees Tara Hill, Katee Schimming, Tara Baugher, Katie Zishka, Dave Clark, Rina Trowbridge and Captain Charlie Cashen all posted negative comments about Hermsen on the Union's Facebook page. (Hermsen Dep., Ex. 1 at 42:15-47:22).

On March 10, 2014, Hermsen responded to a call involving an injured fire fighter who was lying at the bottom of a ladder. ADC Paul Paikowski (who is the spouse of Brenda Paikowski), stood uncomfortably close to Hermsen and later yelled, "When I ask you a question you damn well better answer me." Hermsen asked ADC Paikowski why he was threatening her and he responded, "I'm warning you, give me attitude and it will be the last thing you ever do." Hermsen felt threatened by the actions of ADC Paikowski and

---

[5] Plaintiff argues that even assuming the IT department could not track down posters to Tony's Kansas City, Chief Dyer's inaction with respect to the Union's Facebook page is inexplicable.

filed a complaint with fire administration and City HR reminding them that she was a class action plaintiff and believed ADC Paikowski's actions were retaliatory. Hermsen's partner, Mike Williams, was questioned about the incident and confirmed that ADC Paikowski threatened Hermsen. On April 3, 2014, Hermsen sent an email to Kym Lewis, EEO Manager, asking why her complaint of harassment and retaliation had not been addressed. Lewis responded the following day and said the complaint for retaliation had no merit. (Email of Apr. 3, 2014, from Hermsen to Kym Lewis, Ex. 51); (Email of Apr. 4, 2014 from Kym Lewis to Hermsen, Ex. 51).

**Treatment of Other KCFD Employees**

ADC Fennel, who was not the face of the FLSA complaint, was not terminated for choking Division Chief Mark Mauer. (Hearing of May 14, 2014, Ex. 6 at 173:21-174:7); instead, he was terminated as part of a progressive discipline process. Paramedic Koen, who was not the face of the FLSA complaint, was not terminated, despite the fact that both his partner and Hermsen filed complaints documenting abuse. (Vittori Complaint, Ex. 41). (Berardi Dep., Ex. 19 at 67:14-68:20). Instead, at some point, Koen left his employment with KCFD and was re-hired. (Berardi Dep., Ex. 19 at 65:7-9).

**III. Standard**

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of

evidence" in support of its position. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

<u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

## IV. Discussion

### A. Count I – FLSA Retaliation

Defendants argue they are entitled to summary judgment because plaintiff cannot satisfy the McDonnell-Douglass burden shifting analysis. The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter." 29 U.S.C. § 215(a)(3). The Eighth Circuit uses the familiar McDonnell-Douglas burden-shifting analysis to analyze FLSA retaliation cases. <u>See</u> <u>Grey v. City of Oak Grove, Mo.</u>, 396 F.3d 1031, 1034 (8th Cir. 2005). Therefore, plaintiff must first demonstrate a prima facie case of retaliation. If she does so, the burden shifts to the defendants to articulate a non-retaliatory reason for adverse employment actions. If the defendants succeed in so doing, the burden shifts back to the plaintiff to show that the reasons articulated by the defendants are pretext for retaliation. <u>Id.</u>

#### 1. Prima Facie Showing of Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that she engaged in protected activity, that the defendant took an adverse employment action against the plaintiff, and that there was a causal link between the protected activity and the adverse employment action. <u>Grey</u>, 396 F.3d at 1034-35; <u>Kipp v. Mo. Highway and</u>

Transp. Comm'n, 280 F.3d 893, 896 (8th Cir. 2002). Here, there is no question that plaintiff engaged in protected activity in complaining regarding FLSA violations. The Court next turns to whether defendants took adverse employment action against the plaintiff.

Defendants argue that because the majority of adverse actions taken against plaintiff[6] occurred in the context of the City's disciplinary process, which contains the procedural formalities sufficient to be a contested case for Missouri Administrative Procedures Act ("MAPA") purposes. Thus, defendants argue that the factual and legal conclusions resulting from these hearings are protected from re-litigation through collateral estoppel. A "contested case" is a "proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing." Wheeler v. Bd. of Police Comm'rs of Kansas City, 918 S.W.2d 800, 804 n.2 (Mo. App. 1996); RSMo. § 536.010. See also Kline v. Bd. of Parks & Recreation Comm'rs, 73 S.W.3d 63, 66 (Mo. App. 2002) (finding that the procedures of the City of Kansas City,

---

[6] In the Complaint, plaintiff identifies the following adverse actions:

• disciplining Ms. Hermsen for allegedly abandoning her post when she had permission from her Captain to leave the station and let her dog out;

• allowing rude and threatening messages about Ms. Hermsen to be posted around the stations and on city blogs;

• investigating Ms. Hermsen for failing to run down the aisle in a crowded auditorium to render medical aid to a female patient;

• disciplining Ms. Hermsen for playing a practical joke on a coworker and classifying the minor incident as a violent act;

• disciplining Ms. Hermsen for touching the arm of an inexperienced EMT and then classifying the incident as "offensive conduct;" and

• terminating Ms. Hermsen's employment because she approached the inexperienced EMT and asked her if she knew why she was being investigated for touching Ms. Bechtold's arm at the multi-vehicle fatality crash site.

Doc. No. 1, ¶ 60. The second and third of these resulted in no discipline against plaintiff.

Missouri, amount to a "contested case"). Under MAPA, a person aggrieved by such a decision is entitled to judicial review only after exhaustion of administrative remedies. RSMo. § 536.100.1; James v. City of Jennings, 735 S.W.2d 188, 190 (Mo. App. 1987).

Defendants argue that plaintiff did not exhaust her administrative remedies as to her claims regarding (1) leaving her post in June 2011; (2) throwing the water bottle in June 2013; (3) grabbing the arm of another paramedic in December 2013; and (4) confronting the paramedic in February 2014. With respect to the June 2011 and February 2014 incidents, plaintiff appealed both to the Human Resources Board, and with respect to the June 2011 incident the Board overturned the suspension that Plaintiff originally received and permitted, instead, a letter of reprimand and counseling. Plaintiff did not appeal this finding to the City Manager. With respect to the February 2014 confrontation, the Board found that there was sufficient evidence to support plaintiff's termination. Although defendants argue that plaintiff did not appeal the Board's decision to the City Manager, plaintiff notes that an appeal was filed; however, the result of that appeal does not appear in the record. In the case of the June 2013 water bottle incident (wherein she received a stayed suspension pending successful completion of EAP) and the December 2013 touching at the scene incident (wherein she received only a reprimand), plaintiff did not file an appeal with the Human Resources Board.  Defendants therefore argue that these disciplinary decisions are final administrative decisions not subject to collateral attack.

In response, plaintiff first notes that written reprimands (such as what she received in the 2011 post abandonment case, and 2013 offensive touching case) are not appealable because they do not amount to a demotion, suspension or termination; thus, plaintiff argues that those decisions should not have a preclusive effect.  Furthermore, with respect to the 2013 water bottle incident, plaintiff notes that the suspension was

stayed, and mandatory EAP counseling is not appealable because it does not involve a demotion, suspension or termination.

The Court agrees with plaintiff that the City's findings on the four above-mentioned incidents should not be given preclusive effect, because those decisions were either not appealable or the results of the appeal are not in the record. Furthermore, the Court notes that for collateral estoppel to apply, the issues before the Court and the other tribunal must be *identical* to the issues presented in the present action. See Oates v. Safeco Ins. Co. of Am., 583 S.W.2d 713, 719 (Mo. banc 1979). In the below administrative proceedings, the City was not tasked with considering whether these actions were part of a pattern of harassment and retaliation in response to plaintiff's complaints about FLSA violations. See, e.g., Tolefree v. City of Kansas City, 980 F.2d 1171 (8th Cir. en banc 1992) (finding, in case of a firefighter who alleged he was discriminated against and terminated due to his race, the issue decided in the prior litigation was not identical because the Board never considered any of the discrimination or retaliation issues, id. at 1174). Therefore, this Court finds that the City's previous findings should not be given preclusive effect in the present matter.

### 2. Causal Link between Adverse Event and Protected Activity

Defendants also argue that plaintiffs' alleged adverse employment actions do not amount to a prima facie case of retaliation, arguing that (1) there is no temporal proximity between plaintiff's FLSA complaint and (a) the discipline for job abandonment in 2011,(b) the complaint regarding how she provided aid to a patient at a theater production in December 2012, (c) the June 2013 water bottle incident, (d) the December 2013 offensive touching at the scene of a motor vehicle accident, and (e) her termination for interfering with the investigation of the offensive touching incident; and (2) with respect to the comments made on Tony's Kansas City, as well as the writing on a white board at

plaintiff's station and the phrase "Marissa is a c—t" on the station computer, defendants argue that (a) no one knows if the comments from Tony's Kansas City came from City personnel or not, and plaintiff cannot show that the harassment came from a non-supervisory co-worker (see Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 987 (8th Cir. 1999), (b) no one knows who the comments on the white board were written by or directed at, and therefore she cannot prove a causal link between these messages and protected activity; and (c) with respect to the phrase on the station computer, Chief Dyer had the computers removed and an investigation conducted, but the EEO office found insufficient evidence to discipline any parties for creation of this content.

Plaintiff responds that viewing the history of this matter in the light most favorable to Ms. Hermsen shows that questions of material fact exist as to whether her FLSA complaint was a motivating factor in the defendants' employment decisions. Plaintiff asserts that, here, she submitted her warning paper to Lisa Minardi in March 2011. Between March 2011 and July 29, 2011, Captain Wright announced at union meetings that someone had complained about FLSA violations and was out to harm KCFD. In June 2011, plaintiff was disciplined for the first time by KCFD for photographing a vehicle, not providing her name fast enough at an accident scene, and exchanging words with another employee (plaintiff asserts no one at KCPD had been discipline for a verbal altercation since at least 1999). Then, on July 13, 2011, plaintiff was charged with abandoning her post. On July 29, 2011, plaintiff filed her FLSA class action in federal court. Three days after the filing of the FLSA complaint, derogatory comments were published anonymously on Tony's Kansas City. Although plaintiff's attorneys reported these comments to the City, Chief Dyer took no action to investigate the media posts about Marissa Hermsen and did not tell employees to stop the harassment of Ms. Hermsen. After the FLSA suit was filed, fire fighters left threatening messages on a white

board on the EMS supply locker instructing Ms. Hermsen to leave the department; followed Ms. Hermsen home from work; threatened to kill her dog; and blocked her vehicle in while parked at the station. Although plaintiff complained to fire administrators about this conduct, Chief Dyer was never made aware of it. On or about August 25, 2011 (less than a month after the FLSA suit was filed), Chief Dyer ruled that Marissa Hermsen was guilty as charged on the post abandonment and disciplined her by with an oral and written reprimand and a suspension, which decision was later reversed by the HR Board. On or about September 16, 2011, Marissa Hermsen's partner, Andrew Hanchette, saw "Marissa Hermsen is a cunt" on the desktop at Station No. 35. Chief Dyer did not disseminate any information or warnings to any fire fighter, EMT or paramedic telling them not to post anything on the internal computers or boards that were derogatory to Marissa Hermsen.

On January 31, 2012, Dispatcher Anne Lewis posted negative comments about Marissa Hermsen and her FLSA suit on the Union Facebook page. Ms. Lewis later dispatched Ms. Hermsen to a scene that was not secured. Ms. Hermsen filed a written complaint about Ms. Lewis complaining of safety issues and retaliation, but Ms. Lewis was not disciplined for her post about Ms. Hermsen. In February 2012, Captain Cashen yelled obscenities at Marissa Hermsen, and had openly complained about Ms. Hermsen on the Union Facebook page. No disciplinary action was taken against Captain Cashen other than talking to him about his language and his body language. On or about June 13, 2013, Marissa Hermsen was investigated for engaging in a "violent act" for what she believed was tossing a water bottle in jest at the feet of her supervisor. On or about August 5, 2013, (14 days after Chief Berardi was deposed in the FLSA action, a deposition attended by Hermsen) he found Marissa Hermsen guilty of engaging in workplace violence for tossing a water bottle. Ms. Hermsen's 26.6-hour suspension for

this incident was held in abeyance on the condition that she complete EAP counseling for engaging in "workplace violence."

On or about December 7, 2013, Marissa Hermsen had an encounter with Paramedic Jonathon Koen and felt threatened. She filed a complaint about Mr. Koen's conduct that same day. Fire administrators initially wanted to dismiss Ms. Hermsen's complaint as an issue between union members. Jonathon Koen was never disciplined for the aggressive manner in which he treated Ms. Hermsen. On or about December 13, 2013, Marissa Hermsen was investigated for her actions at a fatality motor vehicle accident scene, despite the fact that no one had complained about her conduct. Ms. Hermsen lightly grabbed the jacket of a paramedic who was working on a deceased patient to obtain information about another victim and to have her hand there in case she tripped on the equipment that covered the ground. On January 8, 2014, Marissa Hermsen filed a motion for summary judgment in the FLSA suit. On January 21, 2014 (thirteen days after summary judgment motion was filed) Assistant Chief Pat Reisenbichler emailed the EAP provider and asked her to delay the release of Ms. Hermsen from the EAP mandate, despite the fact that Marissa Hermsen concluded EAP counseling on December 9, 2013. On February 5, 2014, (less than a month after the summary judgment motion was filed), charges were brought against Marissa Hermsen for interfering with patient care and engaging in offensive conduct regarding her treatment of Elizabeth Bechtold at the fatality accident scene. On February 17, 2014, Ms. Hermsen spoke with Elizabeth Bechtold at the fire station and was threatened by Katee Schimming during the process. On February 21, 2014, Marissa Hermsen was informed that charges of engaging in offensive conduct and interfering with a witness were being brought against her for having a conversation with Elizabeth Bechtold about the fatality accident. On April 11, 2014, Chief Berardi immediately suspended Marissa Hermsen pending her termination of employment.

Although defendants argue that all plaintiff has done is list a laundry list of complaints without linking those negative experiences to the FLSA case, the Court finds that when the facts are taken in the light most favorable to plaintiff, plaintiff has sufficiently established a causal link between the actions complained about and the FLSA case she filed in 2011 and which was progressing throughout the time period where she has alleged retaliation. Summary judgment, therefore, is **DENIED** as to defendants' arguments that plaintiff cannot demonstrate a prima facie case of retaliation.

3. Are Defendants' Non-Retaliatory Explanations for Events Pretextual?

Defendants note that the next step in the McDonnell-Douglas framework is to allow the defendants to present a non-retaliatory explanation for their actions, which they have done through providing the record of their hearings on each disciplinary event. Given that defendants have provided non-retaliatory explanations for their actions, the burden then shifts to plaintiff to show these reasons are pretextual.

"Pretext may be proved either 'by persuading the court that a discriminatory [or retaliatory] reason more likely motivated the employer or . . . by showing that the employer's proffered explanation is unworthy of credence.'" Schweiss v. Chrysler Motors Corp., 987 F.2d 548, 549 (8th Cir. 1993) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). "An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than it takes to make a prima facie case], however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113-14 (8th Cir. 2001). Additionally, the burden is on a plaintiff to show "a genuine issue for trial about whether the employer acted based on an intent to [retaliate] rather than on a good-faith belief that the employee committed misconduct justifying termination." Elam v. Regions Fin. Corp.,

601 F.3d 873, 880 (8th Cir. 2010) (internal quotation and citation omitted). However, "[t]he standard for plaintiff to survive summary judgment require[s] only that plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove defendant's articulated reasons for its actions." O'Bryan v. KTIV Television, 64 F.3d 1188, 1192 (8th Cir. 1995). An employee need not "disprove the exact reason stated by defendants for terminating him" at the summary judgment stage. Id.

Defendants argue that plaintiff has no proof of any other motivating reason for the alleged retaliatory acts. Defendants further argue that plaintiff was not the only individual fighting the City in the FLSA suit, as named in plaintiff's suit was also plaintiff's partner, Andrea Armilio, and a second suit was filed by Diana Frisbee. The City notes it took no disciplinary action against Armilio or Frisbee, and only two of the 244 individuals involved in the lawsuit were terminated for a disciplinary event (plaintiff and one other). Plaintiff, however, has produced evidence that suggests that defendants' reasons for disciplining her changed over time, and that even when no complaints had been filed against her, the people investigating Hermsen's complaints against others would turn their attention to her behavior. Plaintiff has produced evidence that she was disciplined for conduct that others were not, and terminated for conduct that no one else had been terminated for. With respect to the other class members, plaintiff notes it would have been impossible for defendants to terminate all the class members as it would result in a shortage of first responders. Instead, plaintiff suggests there was a target on her back because she brought the FLSA violations to light.

The Court finds that plaintiff has sufficiently demonstrated that questions of material fact remain as to whether defendants' stated motives were pretext for retaliation. Accordingly, defendant's motion for summary judgment as to Count I of the Complaint is

**DENIED.**

### B. Count II.

As discussed previously, in response to defendants' motion for summary judgment, plaintiff indicates that she will abandon her claims in Count II because she cannot demonstrate that the City does not have sovereign immunity, nor can she demonstrate that defendant Berardi is not protected by official immunity. Accordingly, defendants' motion for summary judgment is **GRANTED** as to all claims presented in Count II.

### C. Punitive Damages

Defendants argue that plaintiff is not entitled to punitive damages under the FLSA. Defendants note that, in 1991, the Eastern District of Missouri made a finding, without discussion in Waldermeyer v. ITT Consumer Fin. Corp, that "punitive damages are not available under the FLSA." 782 F.Supp. 86, 88 (E.D. Mo. 1991). Defendants further note that the Eleventh Circuit, in Snapp v. Unlimited Concepts, Inc., 208 F.3d 928 (11th Cir. 2000), looked at FLSA statutes to determine the meaning of "legal relief" available to those that have been retaliated against under the FLSA. 29 U.S.C. § 216(b). In Snapp, the Eleventh Circuit found that, with respect to the explicitly available damages under the FLSA, each of the award types "is meant to *compensate* the plaintiff. Awards of unpaid minimum wages, unpaid overtime compensation, employment, reinstatement, promotion, and the payment of wages lost all attempt to put the plaintiff in the place she would have been absent the employer's misconduct." Id. at 934 (emphasis added). The Eastern District of Missouri has since followed the Snapp opinion, see Huang v. Gateway Hotel Holdings, 520 F.Supp.2d 1137 (E.D. Mo. 2007).

However, as noted by plaintiff, courts are divided as to whether punitive damages are available for FLSA retaliation. Courts finding punitive damages available include:

Travis v. Gary Community Mental Health Ctr., Inc., 921 F.2d 108, 111-12 (7th Cir. 1990); and O'Brien v. DeKalb-Clinton Counties Ambulance Dist., No. 94-6121-CV-SJ-6, 1996 WL 565817 (W.D. Mo. June 24, 1996) (J. Whipple). While defendants argue that this Court is free to choose between the various damages theories, the Court believes the better course of action is to **DENY** defendants' motion at this time, and determine at trial whether plaintiff has made a submissible case for punitive damages.

### D. Emotional Distress Damages

Defendants note that the Eighth Circuit has previously stated that emotional distress damages are not available under the FLSA generally. See Fielder v. Indianhead Truck Line, Inc., 670 F.2d 806, 810 (8th Cir.1982) (finding that the ADEA did not permit compensation for pain and suffering because under the FLSA (a parallel statute to the ADEA), "damages for pain and suffering have never been awarded."). In response, plaintiff cites to a case from the Western District of Missouri Court of Appeals. Altenhofen v. Febricor, Inc., 81 S.W.3d 578 (Mo. Ct. App. 2002), finding damages for pain and suffering to be awardable under the FLSA.

Although Missouri Court of Appeals decisions are not binding authority upon this Court, this Court is persuaded that it should allow plaintiff's emotional distress damages to proceed. Altenhofen examines both Travis, 921 F.2d 108, and O'Brien, 1996 WL 565817, and finds those cases to allow both punitive damages and emotional distress damages in FLSA retaliation cases. Furthermore, although defendants claim the Court is bound by the Eighth Circuit's decision in Fielder, this Court notes that in Fielder the Eighth Circuit cites to the relief available to claimants under 29 U.S.C. §§ 206 and 207, not the relief available under 29 U.S.C. § 215(a)(3), which is the applicable section for FLSA retaliation claims. Accordingly, the Court will **DENY** defendants' motion for summary judgment as to emotional distress damages.

## V.    Conclusion

Accordingly, for all the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. No. 27) is **GRANTED IN PART** as it relates to Count II, and **DENIED IN PART** in all other relevant aspects.

**IT IS SO ORDERED.**

**/S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
United States District Judge

Dated:  March 10, 2017
Kansas City, Missouri